AO 108 (Rev. 06/09, modified by USAO-DC)  Application for a Warrant to Seize Property Subject to Forfeiture by Telephone

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>IN THE MATTER OF THE SEIZURE OF APPROXIMATELY 10.27218208<br>BITCOIN STORED IN NINE MYCELIUM WALLET ACCOUNTS<br>LOCATED ON ONE SAMSUNG GALAXY S8+ MOBILE TELEPHONE<br>PURSUANT TO 18 U.S.C. 981 AND 982 | )<br>)<br>)<br>)    Case No.   23-SZ-12<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of Columbia is subject to forfeiture to the United States of America under 18  U.S.C. § 981(a)(1) and 982(a)(1)(A)

*(describe the property)*:

SEE ATTACHMENT A, HEREBY INCORPORATED BY REFERENCE.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT, HEREBY INCORPORATED  BY REFERENCE.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent James A. Rohls, Jr.
_____
*Printed name and title*

Attested to by the applicant in according with the requirements of Fed. R. Crim. P. 41 by telephone.

Date:  5/5/2023
_____

_____
*Judge's signature*

City and state:   Washington, D.C.
_____

G. Michael Harvey, U.S. Magistrate Judge
_____
*Printed name and title*

AO 109 (Rev. 12/09, modified by USAO-DC)  Warrant to Seize Property Subject to Forfeiture by Telephone

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| | ) | |
| IN THE MATTER OF THE SEIZURE OF APPROXIMATELY 10.27218208 | ) | Case No.   23-SZ-12 |
| BITCOIN STORED IN NINE MYCELIUM WALLET ACCOUNTS | ) | |
| LOCATED ON ONE SAMSUNG GALAXY S8+ MOBILE TELEPHONE | ) | |
| PURSUANT TO 18 U.S.C. 981 AND 982 | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE BY TELEPHONE

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the jurisdiction of the District of Columbia be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

SEE ATTACHMENT A, HEREBY INCORPORATED BY REFERENCE.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before _____5/19/2023_____
*(not to exceed 14 days)*

☐ in the daytime – 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge _____G. Michael Harvey_____ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____5/5/2023_____          _____

*Judge's signature*

City and state:     _____Washington, D.C._____          G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>  23-SZ-12 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:   _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A: PROPERTY TO BE SEIZED</u>**

Pursuant to this warrant, federal law enforcement agents are authorized to effect the seizure of the below identified property:

1. Approximately 10.27218208 Bitcoin (BTC) stored in nine (9) accounts contained within the Mycelium wallet application located on one Samsung Galaxy S8+ Model #SM-G955F mobile telephone with serial number ending in RF9V seized pursuant to search warrant from Roman Sterlingov.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF APPROXIMATELY 10.27218208 BITCOIN STORED IN NINE MYCELIUM WALLET ACCOUNTS LOCATED ON ONE SAMSUNG GALAXY S8+ MOBILE TELEPHONE PURSUANT TO 18 U.S.C. 981 AND 982 | SZ No. 23-SZ-12 |

Reference:     *USAO Ref. #2015R02056*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEIZURE WARRANT**

I, James A. Rohls, Jr., being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a seizure warrant for approximately 10.27218208 Bitcoin stored in nine Mycelium wallet accounts located on one Samsung Galaxy S8+ Model #SM-G955F mobile telephone with serial number ending in RF9V seized from Roman Sterlingov (the "TARGET PROPERTY"). The particular items to be seized are described in the following paragraphs and in Attachment A.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed by the FBI been since September 2002. I am currently assigned to investigations of computer crimes, including those involving virtual currency, money laundering, and the darknet. Prior to my current assignment, I was assigned to a counterterrorism squad specializing in the identification of terrorist activity directed against the United States, as well as identification of the

physical and financial support networks for terrorists who sought to target the interests of the United States and its allies.  In the course of conducting or participating in criminal investigations, I have been involved in interviewing and debriefing witnesses and informants; conducting physical surveillance; tracing and analyzing Internet Protocol (IP) addresses; tracing and analyzing financial transactions, including through blockchain analysis; analyzing telephone pen registers; collecting and analyzing evidence; and preparing and executing search warrants.  I have received organizational sponsored computer training as well as computer training at the SANS institute.  I have received training in the area of computer security and network administration.  I have also participated in the execution of many federal search warrants. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.  Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1956 (money laundering and money laundering conspiracy) and 1960 (unlicensed money transmission) and D.C. Code § 26-1023(c) (money transmission without a license) have been committed by ROMAN STERLINGOV.  There is also probable cause to seize the TARGET PROPERTY described in Attachment A as property subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A).

## STATUTES

5.     Offense Statutes.   This investigation relates to violations of, *inter alia*, Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h); Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(B); and Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960; which provide/state as follows.

6.     **Money Laundering Conspiracy:** 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

   a.   **Promotional Money Laundering:** 18 U.S.C. § 1956(a)(1)(A)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity.

   b.   **Concealment Money Laundering:** 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

   c.   The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations drug trafficking offenses, to wit, "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise

dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)."  18 U.S.C. § 1961(1)(D).

7.      **Sting Money Laundering:**  18 U.S.C. § 1956(a)(3)(B) makes it a crime to conduct or attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity.  This offense is sometimes referred to as "sting" money laundering.

8.      **Operating an Unlicensed Money Transmitting Business:**  18 U.S.C. § 1960(a) provides in relevant part that "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business" shall be guilty of a federal offense.  The term "money transmitting business" is defined as "includ[ing] transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).

9.      The statute provides three definitions of an "unlicensed money transmitting business," corresponding to three kinds of violations of § 1960(a):

a.  **State Licensing Offenses:**  Under 18 U.S.C. § 1960(b)(1)(A), it is a violation to operate a money transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under States law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable."  The definition of "State" includes the District of Columbia.  18 U.S.C. § 1960(b)(3).

b.  In the District of Columbia, anyone engaging in the "business of money transmission" is generally required to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia.  D.C. Code § 26-1002(a).  "Money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Code § 26-1001(10).  Under District of Columbia code, engaging in the business of money transmission without a license is punishable as a felony.  D.C. Code § 26-1023(c).

c.  **Federal Registration Offenses:**  Under 18 U.S.C. § 1960(b)(1)(B), it is a violation to operate a money transmitting business without "comply[ing] with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section."  In turn, 31 U.S.C. § 5330(a)(1) requires anyone who owns or controls a money transmitting business to register with the Secretary of the Treasury.

d.  I am further aware that federal regulations issued pursuant to the Bank Secrecy Act define "money services business" ("MSBs"), which include "money transmitter[s]."  31 C.F.R. § 1010.100(ff)(5).  Money transmitters are defined broadly, and include anyone who "accept[s] . . . currency, funds, or other value that substitutes for currency from one person and . . . transmi[ts] . . . currency, funds, or other value that substitutes for currency to another location or person by any means," as well as "[a]ny other person engaged in the transfer of funds."  31 C.F.R.

§ 1010.100(ff)(5)(i)(A)-(B).  MSBs are required to register with the FinCEN, unless specific exemptions apply. 31 C.F.R. § 1022.380(a)(1).  MSBs are required to establish and maintain anti-money laundering programs, to detect and report suspicious transactions, and to collect certain records of customers and customer transactions.

e.  **Criminal Proceeds/Promotion Offenses:**  Under 18 U.S.C. § 1960(b)(1)(B), it is a violation to operate a money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

10.    I am further aware that Bitcoin "mixers" or "tumblers" are considered to be MSBs under federal law, and they are also considered to be money transmitting businesses under District of Columbia law.  *See* U.S. Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 19-20; *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020).

11.    <u>Forfeiture Statutes.</u>    Pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1960 is subject to criminal and civil forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

12.     This application seeks a seizure warrant under both civil and criminal authority, because the property to be seized could easily be placed beyond process if not seized by warrant, as money and cryptocurrency are fungible and easily dissipated.

13.     18 U.S.C. § 981(b) states that property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. 18 U.S.C. § 982(b)(l) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Seizures are appropriate from this district, because at least one of the predicate acts giving rise to forfeiture occurred in Washington, D.C., as described below.

## PROBABLE CAUSE

14.     The Internal Revenue Service, Criminal Investigation (IRS-CI) and the Federal Bureau of Investigation (FBI) have been investigating an illicit Bitcoin money transmitting and money laundering service called BITCOIN FOG.  As described further below, the investigation identified Roman STERLINGOV as the operator of BITCOIN FOG.  On April 26, 2021, STERLINGOV was charged by complaint in the District of Columbia with money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and money transmission without a license, in violation of D.C. Code § 26-1023(c). STERLINGOV was arrested shortly after midnight on April 27, 2021, after he traveled from Moscow to the Los Angeles International Airport.

15.     On June 14, 2021, a grand jury in the District of Columbia returned an indictment charging STERLINGOV with the same counts as the complaint.  On July 18, 2022, a grand jury in the District of Columbia returned a superseding indictment, charging money laundering conspiracy in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and money transmission without a license, in violation of D.C. Code § 26-1023(c).

**BITCOIN FOG Background**

16.     BITCOIN FOG was an Internet-based service accessible from the District of Columbia and U.S. states.  As of April 26, 2021—shortly before STERLINGOV's arrest— BITCOIN FOG could be accessed through the Tor hidden service located at http://foggeddriztrcar2.onion.  BITCOIN FOG functioned as a Bitcoin "tumbler" or "mixer" service.  It allowed users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.  It worked by disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions.  This process allowed BITCOIN FOG customers engaged in unlawful activities to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoin.  BITCOIN FOG publicly advertised this service as a way to help users obfuscate the source of their bitcoin.  BITCOIN FOG charged customers a fee for this service.

17.     BITCOIN FOG was launched on or about October 27, 2011, and was operational as of April 26, 2021.  The site went down shortly after STERLINGOV's arrest.  The website was one of the original Bitcoin tumbling sites on the darknet.  As described below, more than 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) were sent

through the site from in or about October 2011 through April 26, 2021.  The largest senders of BTC through BITCOIN FOG were darknet markets, such as Agora, Silk Road 2.0, Silk Road, Evolution, and AlphaBay, that primarily trafficked in illegal narcotics and other illegal goods.

18.     BITCOIN FOG was publicly advertised on Internet forums and well-known web pages promoting darknet markets as a tool for anonymizing bitcoin transactions.  The administrator of BITCOIN FOG publicly promoted the service through a clearnet site (www.bitcoinfog.com and www.bitcoinfog.info) and a Twitter page.  These outlets allowed users to easily locate and access the hidden services site through simple clearnet Internet searches.

**<u>BITCOIN FOG Operated as an Illegal Money Transmitting and Money Laundering Service on the Darknet</u>**

19.     Using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through BITCOIN FOG since the site was launched in 2011. This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from other bitcoin addresses through hacks; direct deposits and withdrawals from bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources.  IRS-CI personnel reviewed all inputs and outputs from BITCOIN FOG to identify bitcoins sent directly to BITCOIN FOG from known darknet markets and bitcoins sent from BITCOIN FOG to known darknet markets.  IRS-CI's analysis determined BITCOIN FOG received approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets.  BITCOIN FOG sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets. In sum, BITCOIN FOG sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.

20.     Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG

from at least 35 darknet markets.  Below are the top five markets by U.S. dollar value of deposits:

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

21.     IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least

51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

22.     Based on my training and experience, including experience in other darknet

investigations, darknet markets exist primarily to traffic in illegal narcotics and other illegal goods

and services – a fact well-known among darknet market user and administrators, and intended by

the administrators.  In particular, darknet markets sell stolen personally identifiable information,

financial information including credit card numbers, and computer hacking tools and exploits.

That the darknet markets listed above primarily traffic in illegal narcotics and the other illegal

goods and services noted would be apparent to anyone using the markets because the categories

listed on each market, and the majority of specific listings, openly discuss illegal goods and

services.  I am familiar with each of the darknet markets listed in the tables above and am aware

that illegal narcotics and other illegal goods and services constituted the majority of items for sale

on each market.  Accordingly, there is probable cause to believe that the bitcoin transactions sent to and from BITCOIN FOG involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), such as narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A); and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

**Undercover Transactions on BITCOIN FOG**

*September 2019 Undercover Transaction*

23.     On or about September 11, 2019, an IRS-CI Special Agent (UC) physically located in the District of Columbia and operating in an online undercover capacity accessed BITCOIN FOG at foggeddriztrcar2.onion through the Tor browser.  The UC created an account through the registration page by creating a username and password and entering a security text phrase pictured below the registration text boxes.  The registration page of BITCOIN FOG stated: "As an anonymous service, we do not collect any additional information about you besides a user name and password."

24.     When creating the account, the UC was never asked for any identifying information such as an email account, date of birth, social security number, or passport number, or for any other proof of identification.

25.     On or about September 11, 2019, while physically located in the District of Columbia, the UC sent approximately 0.02488936 BTC ($249.99) from an IRS-CI controlled covert wallet ("UC Sending Wallet") into a wallet address ("the UC Deposit Address") provided by BITCOIN FOG.

26.     On or about September 12, 2019, while physically located in the District of Columbia, the UC accessed foggeddriztrcar2.onion.   The UC's undercover BITCOIN FOG

account showed a balance of approximately 0.02425700. The difference of approximately 0.00063236 BTC between the amount the UC deposited and the balance shown is approximately 2.5% of the total deposit. This is the service fee charged by BITCOIN FOG. On or about September 12, 2019, while physically located in the District of Columbia, the UC sent 0.02 BTC from BITCOIN FOG to an IRS-CI controlled covert wallet ("UC Receiving Wallet").

27.     Through blockchain analysis, investigators traced bitcoin from the BITCOIN FOG deposit address to known BITCOIN FOG bitcoin clusters identified through blockchain analysis. IRS-CI investigators also traced bitcoin sent to the UC Receiving Wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

28.     Investigators were unable to directly trace any direct link between the "UC Sending Wallet" and the "UC Receiving Wallet," confirming that BITCOIN FOG successfully tumbled the transaction by breaking the link in the blockchain between the source and ultimate destination of the funds.

*November 2019 Undercover Transaction*

29.     On or about November 18, 2019, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity sent approximately 0.0117 BTC to the UC Deposit Address at BITCOIN FOG from an IRS-CI controlled undercover account on the Apollon darknet market. Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items. On November 19, 2019, while physically located in the District of Columbia, the SA accessed BITCOIN FOG at foggeddriztrcar2.onion. The UC's undercover account on BITCOIN FOG showed that the account had been credited by the amount of the send transaction, less an approximately 2.32% fee.

30.     On or about November 19, 2019, while physically located in the District of Columbia and after confirming the deposit of funds from Apollon Market had been credited to the UC's BITCOIN FOG account, the UC sent the message below to the BITCOIN FOG administrator using the messaging function on the BITCOIN FOG site, stating the funds were the proceeds of illegal narcotics sales:



**Message history:**

(Answers from our crew appear here.)

(You can also wipe the message history (not undoable)).

hello, i need help.

i created my account to clean my coins from selling ecstasy. I sold molly on apollon and ive been selling on WSM and dream but all the exit scams and cops got me spooked. Im new to this and im worried im gonna get caught.

I need help cleaning my bitcoin and I dont trust the big mixers after best mixer. Bitcoin fog has been around forever you you guys must be doing something right. I have more coins i need cleaned but how do i know I can trust you??? People on bitcoin talk say your a scam.

31.     On or about November 21, 2019, while physically located in the District of Columbia, the UC again accessed BITCOIN FOG operating in an online undercover capacity. There was no response to the above message posted by the SA on or about November 19, 2019. The UC then directed BITCOIN FOG to send 0.01146764 BTC from the undercover account on BITCOIN FOG to an IRS-CI controlled undercover wallet.  BITCOIN FOG did so.

32.     The UC clearly stated that the BTC was from the sale of ecstasy/molly, an illegal narcotic.  At no point did the administrator of BITCOIN FOG prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales.

33.     Through blockchain analysis, investigators traced bitcoin from the IRS-CI controlled account on Apollon Market, to the BITCOIN FOG deposit address, to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced bitcoin sent to the IRS-CI controlled undercover wallet and confirmed that the bitcoin was sourced from a BITCOIN FOG address.

***March-April 2021 Undercover Transaction***

34.     On or about March 10, 2021, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity accessed BITCOIN FOG.  The UC sent three separate deposits to BITCOIN FOG in the amounts of 0.0043444 BTC, 0.00836095 BTC, and 0.0089869 BTC.

35.     On or about April 19, 2021, while physically located in the District of Columbia, the UC contacted the administrator of BITCOIN FOG and advised that the deposited funds were the proceeds of a COVID fraud scheme, stating: "I am in need of partner.  I have many targets in US for my attack. I develop program to lock government corona checks until persons pay me bitcoin ransom. These are first three deposits to the fog."

36.     The UC clearly stated that the BTC was from a COVID fraud.  At no point did the administrator of BITCOIN FOG prevent the use of BITCOIN FOG to launder funds that were represented to be illicit proceeds.

**BITCOIN FOG Is Not Registered with FinCEN or Licensed in the District of Columbia**

37.     Records from the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury, revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was registered as a money services business under federal law, despite conducting transactions with U.S.-based customers.  Similarly, records from the District of Columbia

Department of Insurance and Banking (DISB) revealed that neither ROMAN STERLINGOV nor

BITCOIN FOG was licensed as a money transmitter under District of Columbia law, despite

conducting transactions with persons based in the District of Columbia.

**STERLINGOV's Receipt of Proceeds from BITCOIN FOG**

38.     BITCOIN FOG charges a variable fee of 2% to 2.5% on each deposit.  Blockchain

analysis revealed that these fees are retained within the BITCOIN FOG cluster, and that the

administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself.  These

withdrawals occur sporadically and in the same manner as a regular user.  The withdrawals appear

to be concealed to blend in with regular mixing transactions in order to protect the site

administrator from scrutiny.   Based on BITCOIN FOG's transaction activity over time,

STERLINGOV would have made approximately $8 million in commissions from BITCOIN FOG

transactions if he had cashed out the administrative fees near the time that the transactions

occurred.  Due to the significant increase in value of bitcoin over the course of BITCOIN FOG's

operation – from a low of approximately $2 shortly after BITCOIN FOG launched in fall 2011 to

a current value of $50,000 – STERLINGOV has been able to reap significant appreciation from

his profits that were kept in bitcoin.  The current value of the BITCOIN FOG cluster – including

customer funds in STERLINGOV's control and STERLINGOV's own money – is nearly $70

million.

39.     Law enforcement examined bitcoin accounts controlled by STERLINGOV at

several cryptocurrency exchanges. Analysis of Sterlingov's accounts revealed the vast majority of

cryptocurrency deposited into his accounts was originally sourced and traced back to BITCOIN

FOG.   STERLINGOV utilized a variety of methods to remove BTC from BITCOIN FOG,

including direct transfers to exchange accounts held in his name, withdrawals from BITCOIN FOG

to intermediary BTC wallets before cashing out BTC through exchanges, and using BTC from BITCOIN FOG to purchase goods and services, gift cards and other cryptocurrencies.

**The TARGET PROPERTY**

40.    The FBI has access to software tools that analyze financial transactions on the Bitcoin blockchain.  I have found these tools to be reliable in numerous previous investigations. One such software tool identified a cluster of approximately 925,000 Bitcoin addresses attributed to BITCOIN FOG (the "BITCOIN FOG CLUSTER").  The BITCOIN FOG CLUSTER contained the UC Deposit Address known to belong to BITCOIN FOG.  Blockchain analysis conducted in support of this affidavit relied upon attribution of addresses in the BITCOIN FOG CLUSTER provided by this software tool in the determination of the source of funds in the Mycelium wallet.

41.    Pursuant to a search warrant (21-SW-134) issued by United States Magistrate Judge G. Michael Harvey in the United States District Court for the District of Columbia on April 30, 2021, I reviewed the contents of one Samsung Galaxy S8+ Model #SM-G955F mobile telephone with serial number ending in RF9V, which was among the luggage and electronic devices in STERLINGOV's possession when he was arrested on April 27, 2021.  Based on my review, I located an application on STERLINGOV's Samsung mobile telephone titled "Mycelium."  I know based on my training and experience that Mycelium is a smartphone cryptocurrency wallet application used to send, receive, and store cryptocurrency on an individual's smartphone. Contained within the Mycelium application located on the Samsung mobile telephone, I identified sixteen (16) individually-labeled "accounts" with corresponding bitcoin wallet addresses.  Seven (7) of these accounts showed a zero balance.  Nine (9) of these accounts, with their corresponding wallet addresses, showed varying bitcoin balances which total approximately 10.27218208 BTC.

42.     Based on the nine (9) accounts containing bitcoin balances, along with their corresponding wallet addresses which were identified within the Mycelium application on STERLINGOV's Samsung mobile telephone, further referenced above in paragraph 40, law enforcement conducted blockchain analysis to determine the portion of these funds sourced from the BITCOIN FOG CLUSTER.  This analysis identified multiple, indirect paths funds took from addresses within the BITCOIN FOG CLUSTER to the Mycelium wallet addresses contained on the TARGET PROPERTY.  Based on my training and experience, the indirect paths contained multiple addresses which were consistent with peel-chains.  A peel chain is a pattern of Bitcoin transactions that occurs when a relatively large amount of Bitcoin is gradually spent in multiple, sequential transactions such that each transaction has two outputs; one output constituting a payment to a separate entity, and one output consisting of the "change" (or the remainder of the initial value) sent to a new Bitcoin address which is controlled by the same entity as the original address.  Blockchain analysis is required to assess which output represents a payment and which output represents the "change" and is therefore controlled by the original entity.  Of the approximately 10.27218208 BTC within the Mycelium application on STERLINGOV's Samsung mobile telephone, approximately 9.69330243 BTC (or approximately 94%) were sourced from the BITCOIN FOG CLUSTER.

43.     Based on the forgoing, there is probable cause to believe the contents of the nine (9) Mycelium accounts located on STERLINGOV's Samsung mobile telephone contain funds involved in operation of BITCOIN FOG.  Accordingly, I request that the Court issue the proposed seizure warrant for the nine (9) Mycelium accounts contained on STERLINGOV's Samsung mobile telephone.  The government will execute the seizure by transferring the contents of the wallets to a government-controlled wallet.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

44.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that staff from the United States Attorney's Office are capable of identifying my voice and telephone number for the Court.

### CONCLUSION

Based on the forgoing, I request that the Court issue the proposed seizure warrant.

Respectfully submitted,

_____

James A. Rohls, Jr.
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 5, 2023.

_____

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE